## GRIEVANCE COMMITTEE
### vs.
## RALPH WOOLFSON

Superior Court          Hartford County          File #50270

Present:  Hon. CARL FOSTER, Judge.

Hugh M. Alcorn,
   State's Attorney,                Attorney for the Plaintiff.

J. H. Peck,                        Attorney for the Defendant.

MEMORANDUM FILED AUGUST 3, 1935.

FOSTER, J.   Ralph G. Woolfson is an attorney at law duly admitted to the practice of law in the courts of this state and has been a member of the Bar of Hartford County for about ten years.

The Grievance Committee of the Bar of Hartford County has filed its complaint with this Court, alleging that Woolfson has been guilty of offenses involving his character, integrity, personal standing and conduct, and has set forth with particularity the acts of which complaint is made.

Honorable Patrick B. O'Sullivan, a Judge of this Court, issued an order to show cause, which was duly served upon Woolfson, and the Grievance Committee, represented by the State's Attorney of Hartford County, and Woolfson, duly represented by counsel, have been fully heard by this Court.

The statute law governing the conduct of an attorney at law is his oath of office, which is as follows:

"You solemnly swear that you will do no falsehood, nor consent to any to be done in court, and, if you know of any to be done, you will give information thereof to the judges, or one of them, that it may be reformed; you will not wittingly or willingly promote, sue or cause to be sued, any false or unlawful suit, or give aid, or consent, to the same; you will delay no man for lucre or malice; but will exercise the office of attorney, within the court wherein you may practice, according to the best of your learning and discretion, and with fidelity, as well to the court as to your client."

**General Statutes, Sec. 2234.**

The simple interpretation of this statute is that the lawyer must do what is right.

When one consults a clergyman, he does so with the utmost faith. When one consults a physician, he relies upon the advice and treatment received for his physical well being. When one consults a lawyer, he often places within the control of such lawyer estate, physical well being, moral safety, liberty and even life itself. No men, as a class, have greater responsibility than does the lawyer. The lawyer must so act that the client may place complete reliance upon him, that

the Court whose officer he is may have full confidence in him, and that he may bring no discredit upon his profession.

In a proceeding such as this, the Court seeks not to punish for errors committed, but seeks to protect the public from the unrighteous acts of a lawyer who has intentionally done wrong, or to clear the name and reputation of a lawyer unjustly charged with wrong doing. No case casts a greater responsibility on a court than does one such as this. If the decision be in favor of the lawyer, he continues the practice of the law having behind him the assurance of the Court to the public that in the matters presented he has done no wrong; if the decision be against him, he is deprived not alone of money or of the right, for a time at least, to earn money in his profession, but his reputation is tarnished beyond complete repair. The Court must protect the public from evil doing and must protect the lawyer from unjust accusation.

So it properly is that grievance committees are slow to present a lawyer to the Court, and do so only after careful investigation, and not at all on account of honest error or slight mis-step from the straight path of duty; and likewise the Court will act only after exhaustive review and analysis of the facts presented and the law applicable thereto.

In March 1932 one Tessie Pappas, wife of Nicholas Pappas, was injured in an automobile accident. She and her husband consulted Woolfson with a view to seeking damages for the injury. Woolfson undertook to represent her in the matter. From what she told him and from information given him by physicians, Woolfson did not consider her entitled to heavy damages. She and her husband paid Woolfson no retaining fee. The insurance company that insured the person by whom she was injured at first offered only $250. in settlement but at the time of trial offered $1400., which was declined; and upon trial the jury, on November 18th, 1932, rendered a verdict of $3500. in favor of Tessie Pappas. About December 5th, 1932 Woolfson persuaded Mrs. Pappas to assign to him her interest in this verdict in the following form.

"KNOW ALL MEN BY THESE PRESENT, That in consideration of professional services rendered and to be rendered, obligations incurred and to be incurred, monies advanced or to be advanced in connection with the preparation and trial of and all of the proceedings

taken or to be taken in the above entitled action by Ralph G. Woolfson, of the Town of Hartford, and in be owed by me to various persons, payment of which has be owed by me tovarious persons, payment of which has been or will be guaranteed in writing by said Woolfson, I, Tessie N. Pappas, the plaintiff herein, of said Town of Hartford, hereby sell, assign, transfer and set over unto said Woolfson, all my right, title, interest and claim in and to any final judgment rendered or to be rendered against the defendant in the above entitled action. The amount of the verdict and judgment rendered therein is at this date $3500.00 and costs.

TESSIE N. PAPPAS.

State of Connecticut,
County of Hartford,                Hartford, Conn., December
                                            5th, 1932.

Personally appeared Tessie N. Pappas, signer of the foregoing instrument, and acknowledge the same to be her free act and deed, before me,

JOSEPH I. KOPELMAN,
Commissioner of the Superior Court."

At the foot of the assignment following the signature, Woolfson wrote the words:

"I hereby agree for myself, heirs and representatives that all monies left over in my hands after above assign- ment has fulfilled its purpose, will be turned over by me to said Tessie N. Pappas.

RALPH G. WOOLFSON."

In December 1932 and during the year 1933, four actions were instituted against Tessie Pappas, one by one Fazioli, one by one Leonard, one by one O'Loughlin and one by one Lieblick, and in each of these actions the insurance company that owed her the judgment of $3500. was garnisheed. The Fazioli, the Leonard and the O'Loughlin actions were won by Woolfson for Mrs. Pappas upon trial before a Court. In the Lieblick action, a judgment was rendered against her for about $4100.

In March 1933 the insurance company instituted an action of interpleader, acknowledging its liability for the judgment of -3500. and interest and costs, and asking a judgment of

this Court determining the rightful owners of the money to which it itself made no claim of ownership. This action came to trial in this Court and, after conference with the Presiding Judge in Chambers, the following stipulation was entered into by the parties.

"It is hereby stipulated in the above entitled cause of action as follows:

1. That judgment be entered directing the Clerk of Court to pay out of the funds deposited in his hands the sum of $66.70 to the Travelers Insurance Company, in full satisfaction of the cost of the suit.

2. That judgment be entered directing the Clerk to pay the sum of $2,000 to Ralph G. Woolfson in full satisfaction of his claim.

3. That judgment be entered directing the Clerk to pay to the Superior Court the sum of $13.00 for disbursing all funds.

4. That judgment be entered directing the Clerk to pay to Yetta Lieblick the sum of $1,526.22, thereby leaving nothing in the hands of said Clerk from the $3605.92 deposited with him.

5. That the judgment to be entered decree that the plaintiff herein is discharged from all liability to all the defendants herein, in relation to the said sum of $3605.92.."

In the Lieblick case and in the interpleader case Woolfson claimed to own all of the judgment of $3500. by reason of the assignment to him by Mrs. Pappas. Mrs. Pappas is in Europe and has not been heard in this case. Nicholas Pappas testifies that Woolfson agreed that he was to receive a fee of $1000. for securing the $4500. judgment. This Woolfson denies. His claim is that when he thought Mrs. Pappas not entitled to heavy damages, he agreed with her and her husband that he should receive a contingent fee of fifty per cent of the amount recovered; but that when the verdict was returned for so large an amount as $3500. he expected less than fifty per cent and told the Pappases that he would deal fairly by them.

It is not within the province nor is it the duty of this Court in this proceeding to reach any determination as to the pro-

priety or reasonableness of the fees charged in these matters by Woolfson. The inquiry here is whether Woolfson has committed any unprofessional acts in violation of his oath of office as an attorney. If a determination of this matter rested upon acceptance, at its face value, of the denied testimony of Nicholas Pappas ,the principal witness against Woolfson, the Court would find that the State's Attorney had not proved the allegations made by the Grievance Committee by a fair preponderance of the evidence.

At the trial of the Lieblick case, Tessie and Nicholas Pappas testified, in effect, that they had an agreement to pay Woolfson fifty per cent of the judgment of $3500. Here Nicholas Pappas testifies that he and his wife so testified in that case under instruction and direction of Woolfson, he and they knowing it to be false. As to this, Woolfson here testifies:

"Q. Mr. Pappas testified here yesterday that you instructed him and his wife to testify falsely in that case that they had an agreement to pay you one-half of the proceeds of the Neville case. What do you say about that, Mr. Woolfson?

A. I say that they told the truth. I told them to testify just exactly what the truth was, and that we had this original understanding, which had never been changed, as to fifty per cent division, and they so testified, I believe.

Q. Did you take the stand in the Lieblick case?

A. Yes, sir.

Q. In the City Court?

A. Yes, sir.

Q. What did you testify on the subject of your agreement for fees?

A. I testified practically along the same lines as I am testifying in this Court today; that the case arose from small beginnings, and I stated the history of the way we first talked about fees, and that I told them that since the case seemed so trivial to me, I expected a fifty per cent division at that point, and that nothing further, definite, had ever been talked about along the line of fees after

that. That was my testimony in the CityCou rt, and that was the testimony of my clients in the City Court."

Since there was in existence the assignment in question, the Court is not willing to hold that there was not fair basis to support such testimony.

When we consider the claims made by Woolfson in the interpleader case, we do not rely upon testimony other than that given by Woolfson himself in this case. Woolfson knew at that time that notwithstanding the assignment from Tessie Pappas to him, she did not owe him fifty per cent of $3500.

As to this he testifies:

"Q. Did you feel it was fair to ask them fifty per cent of the judgment?

A. Well, at what time?

Q. On November 18th.

A. Well, on November 18th, I did not feel—after the verdict—

Q. Yes.

A. No, at that time I felt that fifty per cent probably would not be fair because we had gotten so much more.

Q. You thought it was too much?

A. Yes.

Q. Now, wait a minute. You thought $1750.00 was too much, on November 18th, or shortly afterwards, didn't you,

A. I felt, in my mind, if no other complications had come up, if we got the mony, in other words if $3500.00 and costs were paid, that in my. mind I could not con-scientiously at that time keep seventeen hundred and fifty.

Q. You could not have,

A. No.

Q. Did you tell that to the Pappases?

A. No, because I felt, as I say, that the verdict was so excessive.

Q. It was unsettled when you drew this assignment?

A. It was unsettled in this way, the verdict she had was so large, and unexpectedly so large, that I could not conscientiously charge fifty per cent.

Q. But she did not know whether you were going to charge her $1750.00 on that date?

A. Well, I wasn't sure, because, as I say I did feel that half of the $3500.00, if we should finally recover $3500.00 would be unconscionable to charge, it having come to that stage from the small beginning.

Q. You felt that that was too much, didn't you?

A. Well, eventually I could not have charged her that much if we had gotten the $3500.00, assuming that we had gotten it.

Q. Well you got it didn't you?

A. No, I mean if we had gotten the money, I mean if we had gotten the money intact without having paid out to other creditors, to Mrs. Lieblick; a big portion of it was paid to Mrs. Lieblick, about $1600.

Q. Why did it make any difference what Mrs. Pappas did with her money, as to your fees?

A. My fees,—as to my fees?

Q. Yes, if you thought your fees should be less than $1750.00, what difference did it make what Mrs. Pappas did with her money, whether she gave it to Mrs. Lieblick or not?

A. I don't quite understand.

Q. As I understand it, the reason that you put that you thought the $1750.00 was fair was because you didn't get money, is that right? I don't understand your reason for it.

A. No, $1750. was really the agreement, as far as any agreement we ever had was definite, but I felt that if we should ever come into all that money, and not to have to pay anything out to creditors that I could not keep $1750.00 for myself; it is too much. $1750.00 was too large a fee, in spite of the fact that the agreement

was fifty per cent, and the only agreement I ever knew of.

Q. What did the payment of creditors have to do with the amount of your fee?

A. Payment of creditors, should have nothing to do with payment of my fee."

Notwithstanding his knowledge that he knew that fifty per cent of $3500. was more than that to which he was entitled, Woolfson claimed in the interpleader case fifty per cent of $3500. for his services and disbursements in recovering the judgment of $3500., and he also claimed other fees in the other cases, the total of all of which would amount to more than $3500. While it is true that Tessie Pappas would receive no part of the $3500. by reason of the other claims against her, this was no excuse for Woolfson misrepresenting to the Court the amount due him. If he had believed, though erroneously, that these amounts were due him, he had the right to make the claim. Knowing these amounts were not owed to him, he did not have the right to make the claim and then to urge it in court and in Chambers before a Judge of this Court.

The evidence of just what knowledge Woolfson had at this time and what he did and his motives for what he did clearly appear in his testimony in this proceeding.

"Q. And in the action here in this Court, the interpleader action, you claimed $1750.00 as your fee in Pappas vs. Neville case?

A. Yes, sir.

Q. So that you changed your mind from the time the assignment of the judgment was drawn to the time of the action in this court?

A. I did not.

Q. How do you explain that you did not feel $1750.00 fair at that time, and you did when you got to this Court?

A. I set up $1750.00 as the agreed fee,, the only contract that I know of between myself and my client.

Q. Wasn't there a lot of conversation with your client in which you told your client you would be fair?

A. That's right.

Q. What did that have to do with your fifty per cent claim?

A. There had been no definite talk about figures, when I said I would be fair, and I still feel there was only one contract that had ever been made.

Q. You talked with your client twice about fees, once on the basis of fifty per cent, and the other time on the basis of being fair with him?

A. That's right.

Q. And you feel that fifty per cent agreement held?

A. I felt at the time of Mrs. Lieblick's case, in view of all the work that I had had to put in in this matter—

Q. In which matter?

A. In the matter subsequent to the original case, that is the attaching, the claims, the cases involving attachments upon this fund, and I felt, in view of all that work that I had to put in, that I was unquestionably entitled to the contract price.

Q. Well, but you made separate claims for all of those fees, didn't you?

A. Yes, I did.

Q. Didn't you make a separate claim for your fees in the O'Loughlin case, in the Leonard case, and in the Lieblick case?

A. That's right

Q. You did not include those fees in the fee in the Neville case, did you?

A. Well, I had back in my mind, I had this idea, that perhaps I would not be allowed my fees in the subsequent attaching cases, for some reason or other, and that I would only be allowed my fee in the Nevill case, and, therefore, I tried to include as much as possible, some of my work in the subsequent cases in the Neville case. I will admit that that was in the back of my mind, that I looked—I anticipated perhaps that I would not be able to eventually obtain fees for my work in the subsequent attachments, and therefore, I felt that the fee

of fifty per cent should be paid me in the Neville case, according to the original contract.

Q. You did not anticipate that when you drew this assignment?

A. No, because at the time of the assignment I only knew of the two smaller cases that might be brought. I did not know whether they would be—at least I knew of the Leonard and the O'Loughlin claims at that time.

Q. But when you were in this Court, Mr. Woolfson, didn't you claim the $1750.00 for your fee in Pappas vs. Neville, didn't you claim $1300.00 in the Leonard, O'Loughlin and Fazioli cases, and didn't you claim $500.00 in the Lieblick case, making a total of $'800.00 in all?

A. I remember making claims, but they were only claims.

Q. Isn't that the pleading that you filed?

A. Yes, that is the pleading, but I don't think the Court would allow all those claims, or the full amount of any one of them.

Q. You testified that you had a claim against Mrs. Pappas on these other three, the Leonard, O'Loughlin and Fazioli cases.

A. Yes, I felt I had a claim, and I told the Court what I thought the claim was.

Q. You were going to charge Mrs. Pappas $1750.00— this is what you testified and what your pleadings show— you were going to charge $1750.00, and $1300.00 in the Leonard, O'Loughlin and Fazioli claims, and you were going to charge $500.00 in addition to that on the Lieblick case, so that's why you claimed the whole $3500.00 in this court, isn't it?

A. No, I felt that since Mrs. Pappas had no further interest in this case, in the interpleader action, because her judgment, that is Mrs. Lieblick's judgment of $4100.00, or $4200.00 would more than eat up the amount of the verdict; I felt that I was going to attempt to get as much as I could for myself, by asking for as much as

I possibly thought I could get for any one of those cases, that is all of the subsequent cases, but I did not think that the amounts would be sustained by the Court, or that the Court would allow them.

Q. You asked for the whole $3500.00?

A. I asked for it. I don't know.—it doesn't do any harm to ask.

Q. If you would have been able to have gotten the full $3500.00 you would have taken it?

A. I would not.

Q. Then why did you claim it?

A. You mean if—if these items had been allowed me as fees.

Q. If all of your claim had been allowed you would have taken it?

A. As fees—if the Court, by judgment, felt that I was entitled to those amounts as fees, I think I would be foolish not taking it.

Q. You would have taken it on the basis of this assignment of judgment dated December 5th, 1932, wouldn't you?

A. No, I wouldn't; I would take it on the basis of the agreement between the parties for a fifty per cent fee, still my right under the law to accept a fee in defending the other cases.

Q. Mr. Woolfson, didn't you claim that the whole judgment was assigned to you, and that you were prior to the Lieblick case and every other case, for all of your fees?

A. I claimed that whole judgment."

By reason of these claims improperly and falsely made, the parties to the interpleader action, after conference in Chambers with a Judge of this Court, entered into the stipulation for judgment above quoted, whereby Woolfson received $2000. From this sum Woolfson was to pay the disbursements of the trial in which the verdict of $3500. was rendered. A bill of an engineer for $45. Woolfson settled for

$30., claiming it was excessive. A bill of a physician for $100. he has never paid, claiming it was excessive.

It is perfectly clear from the testimony of Woolfson himself in this proceeding that he knowingly and falsely misrepresented facts to this Court, and to a Judge of this Court in Chambers, and that he did so for his own enrichment. Such conduct of an attorney cannot be overlooked or excused by this Court.

As we have endeavored to carefully scrutinize the evidence and base our conclusions upon subordinate facts undisputed and upon the testimony of Woolfson himself, giving him the benefit of all doubt, so, with the same care, we must consider what disciplinary measure the facts warrant. The conduct of which Woolfson is guilty is too serious for mere reprimand. On the other hand, he has not been guilty of theft or any crime that would warrant permanent suspension or disbarment. His offense may be characterized as "sharp practice", a total lack of comprehension of the duty of a lawyer to the public in general, a failure to possess a full realization of the obligation owed by the attorney to the Court, a willingness to walk so close to the line separating right from wrong that the pressure of self-interest may temporarily cause a slipping to the side of wrong.

The said Ralph G. Woolfson is suspended from the practice of law in the courts of this state for a period of one year.